**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| AIRGAS, INC. | : | |
| Plaintiff, | : | CIVIL ACTION NO: 10-612 (ECR) |
| vs. | : | |
| CRAVATH, SWAINE & MOORE LLP | : | JURY TRIAL DEMANDED |
| Defendant. | : | |

## AMENDED COMPLAINT

Plaintiff, Airgas, Inc. ("Airgas"), by its undersigned attorneys, files this Amended Complaint against Cravath, Swaine & Moore LLP ("Cravath").  Plaintiff seeks damages, including punitive damages, upon the following causes of action:

### PARTIES

1.     Plaintiff, Airgas, is the United States' largest distributor of industrial, medical, and specialty gases and related equipment, safety supplies and MRO products and services to industrial and commercial markets.  Through approximately 400 acquisitions, Airgas has built the largest national distribution network in the packaged gas industry.  Airgas is a Delaware corporation, and maintains its headquarters in Radnor, Delaware County, Pennsylvania.

2.     Defendant, Cravath, is a limited liability partnership law firm headquartered in New York, New York.

### JURISDICTION AND VENUE

3.     This Court has personal jurisdiction over Cravath in that Cravath has acted to cause harm in Pennsylvania and committed acts in Pennsylvania which give rise to Airgas's cause of action.

4.     This Court has subject matter jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1332(a), which confers federal jurisdiction upon controversies between citizens of a state and citizens of a foreign state where the matter in controversy exceeds the sum of $75,000.

5.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(2) in that a substantial part of the events giving rise to the claims at issue herein occurred in this judicial district.

## FACTS GIVING RISE TO A CAUSE OF ACTION

6.     This dispute as between Airgas and its counsel relates to an ongoing commercial business dispute as between two public corporations which Cravath represented.

7.     In or around May of 2001, Airgas retained defendant Cravath to provide legal advice relative to financing matters; Airgas has relied upon Cravath to provide that guidance through at least October 2009.

8.     Cravath served as strategic and legal counsel to Airgas on no less than 25 distinct substantial financing transactions through October 2009.  Cravath also assisted Airgas as it addressed sensitive personnel issues, including the departure of Airgas's President and COO in 2005, and with the financing for Airgas's European acquisitions in 2008.  In the winter of 2008-09, Cravath provided legal counsel regarding the issuance of a senior note offering during negotiations for the acquisition of a Florida-based gas distribution company.  Cravath also provided counsel with respect to potential litigation involving Accounts Receivable Co-Purchasers.

9.      During the course of its continuous representation of Airgas from 2001 through 2009, and by way of example, Cravath served as strategic and legal counsel to Airgas relative to each of the following transactions and issues:

a.      Strategic and financing counsel for Senior Subordinated Notes issued by Airgas on July 30, 2001, due on October 1, 2011;

b.      Strategic and financing counsel for Senior Subordinated Notes issued by Airgas on March 8, 2004, due on July 15, 2014;

c.      Strategic and financing counsel for Senior Subordinated Notes issued by Airgas on June 10, 2008, due October 1, 2018;

d.      Strategic and financing counsel for Senior Notes issued by Airgas on September 11, 2009, due September 15, 2015;

e.      Strategic and financing counsel for Airgas's Tenth Amended & Restated Credit Facility, dated as of July 30, 2001, terminating July 30, 2006;

f.      Strategic and financing counsel for the First Amendment to Airgas's Tenth Amended & Restated Credit Facility, dated as of December 31, 2001;

g.      Strategic and financing counsel for the Second Amendment to Airgas's Tenth Amended & Restated Credit Facility, dated as of August 20, 2002;

h.      Strategic and financing counsel for the Third Amendment to Airgas's Tenth Amended & Restated Credit Facility, dated as of May 2, 2003;

i.      Strategic and financing counsel for the Fourth Amendment to Airgas's Tenth Amended & Restated Credit Facility, dated as of February 6, 2004;

j.      Strategic and financing counsel for Airgas's Eleventh Amended & Restated Credit Facility, dated as of January 14, 2005, terminating January 14, 2010;

k.      Strategic and financing counsel for Airgas's Twelfth Amended & Restated Credit Facility, dated as of July 25, 2006, terminating July 25, 2011;

l.      Strategic and financing counsel for the First Amendment to Airgas's Twelfth Amended & Restated Credit Facility, dated as of July 3, 2007;

m.      Strategic and financing counsel for the Second Amendment to Airgas's Twelfth Amended & Restated Credit Facility, dated as of April 2, 2008;

n.  Strategic and financing counsel for the Third Amendment to Airgas's Twelfth Amended & Restated Credit Facility, dated as of July 28, 2008;

o.  Strategic and financing counsel to Airgas for Airgas's Amended & Restated Receivables Purchase Agreement, dated as of December 19, 2002;

p.  Strategic and financing counsel for the First Amendment to Airgas's Amended & Restated Receivables Purchase Agreement, dated as of July 30, 2004;

q.  Strategic and financing counsel for the Second Amendment to Airgas's Amended & Restated Receivables Purchase Agreement, dated as of February 28, 2005;

r.  Strategic and financing counsel for the Third Amendment to Airgas's Amended & Restated Receivables Purchase Agreement, dated as of January 31, 2006;

s.  Strategic and financing counsel for the Fourth Amendment to Airgas's Amended & Restated Receivables Purchase Agreement, dated as of December 31, 2006;

t.  Strategic and financing counsel to Airgas for Airgas's Second Amended & Restated Receivables Purchase Agreement, dated as of March 21, 2007;

u.  Strategic and financing counsel for the First Amendment to Airgas's Second Amended & Restated Receivables Purchase Agreement, dated as of December 11, 2007;

v.  Strategic and financing counsel for the Second Amendment to Airgas's Second Amended & Restated Receivables Purchase Agreement, dated as of March 18, 2009;

w.  Strategic and financing counsel for a loan issued by ABN AMRO Bank N.V., on April 2, 2008 to Red-D-Arc Limited;

x.  Strategic and financing counsel for a loan issued by The Royal Bank of Scotland Plc acting as agent for National Westminster Bank Plc on April 3, 2008 to Red-D-Arc (Netherlands) B.V. and Airgas, Inc.;

y.  Strategic and financing counsel for a loan issued by The Royal Bank of Scotland Plc acting as agent for National Westminster Bank Plc on April 3, 2008 to Red-D-Arc (UK) Limited and Airgas, Inc.;

z.  Counsel to Airgas between July 2001 and February 2002 relative to financing the purchase of the U.S. packaged gas assets of competitor Air Products, Inc.;

aa.   Counsel to Airgas from January 2004 through July 2004 relative to the financing of the acquisition of the U.S. packaged gas assets of competitor BOC;

bb.   Financing counsel to Airgas relative to sensitive personnel matters affecting the highest level of the Airgas organization, including the negotiated departure of Airgas's then President and Chief Operating Officer in 2005;

cc.   Counsel to Airgas between late 2008 and 2009 concerning a sensitive commercial dispute, relative to which Airgas was contemplating litigation.

dd.   Advised Airgas on capital structure changes and financing strategies, and prepared a board resolution, during September and October 2009.

10.   Over the course of this nine-year relationship with Cravath, Airgas paid well over $2,000,000.00 to Cravath for its legal services.  In fact, in mid-October 2009, Cravath issued an invoice to Airgas in the amount of $322,800.00, which Airgas promptly paid in full.

11.   Through its continuous representation of Airgas from 2001 through 2009, Cravath developed an intimate knowledge of Airgas's operations, finances, executive personnel and their agenda, and corporate expansion and differentiation strategies.

12.   In providing legal counsel to Airgas over the course of nearly a decade, Cravath had broad access to Airgas's confidential corporate records, including minute books, commercial agreements, and other non-public and sensitive information concerning Airgas's internal operations, finances, and market strategies.  Cravath's lawyers had access to all of Airgas's Board and Committee minutes, including the confidential minutes of Airgas's Audit, Finance, and Corporate Governance and Compensation Committees.  Airgas's executive staff routinely shared with Cravath attorneys non-public financial and other strategic business information regarding, for example, Airgas's capital structure, financing preferences, business concerns, projected liquidity position and anticipated operating performance.

13.     As Airgas's exclusive financing counsel, Cravath was always involved early in the financing process and was, therefore, privy to Airgas's confidential financing strategy. Airgas would consult Cravath's lawyers before approaching banks for financing, and it relied on Cravath's lawyers to represent Airgas's best interests when negotiating substantial loan terms with banks. Joseph Sullivan ("Sullivan"), Airgas's Vice President and Treasurer, and its primary contact with Cravath, regularly sought the advice of Cravath attorneys before formulating financial strategies, apprising management of what terms to expect in the next round of financing documents, and negotiations with financing counterparties.

**Airgas Remained An Active Client of Cravath Through October of 2009**

14.     In August and September of 2009, Cravath represented Airgas on a five-year, $400 million 4.5% senior note offering.[1]  In the course of this representation, Sullivan spoke freely and candidly with Cravath regarding capital structure issues that Airgas was confidentially evaluating, including the market repurchase of and/or tender for outstanding debt and possibly refinancing the Accounts Receivable Securitization.  Airgas asked for Cravath's legal advice on how these considerations were to be disclosed in the "roadshow" presentation used to market the notes.  Cravath had access to proprietary information concerning Airgas's outlook for sales, cash flow, and earnings, as well as the strategies Airgas was employing to achieve those targets. Cravath also learned of Airgas's confidential acquisition strategy.

---

[1] The legal services provided by Cravath in connection with this offering included:  preparation of the Form S-3 Registration statement filed with the SEC and the Prospectus; review of the Underwriting Agreement with the investment banks; review of the indenture between Airgas and The Bank of New York Mellon, as Trustee; preparation of accompanying Resolutions of the Airgas Board of Directors; preparation of Officers' Certificates for the Company and the Guarantors; delivery of a Legal Opinion letter to the Underwriters ("10b-5 letter"); delivery of a Negative Assurances Letter to the Underwriters; delivery of a Reliance letter addressed to the Trustee; retention and coordination of supporting legal opinion letters from five local law firms rendered pursuant to the Underwriting Agreement; preparation and finalization of the closing documents; and representation of Airgas at the closing itself.

15.    On Friday, September 4, 2009, a Cravath lawyer worked in Airgas's offices, in Radnor, Pennsylvania, to perform due diligence on this impending bond issuance.  As part of the due diligence process, Cravath lawyers had access to confidential Airgas information, including minute books, correspondence between Airgas's auditors and its audit committee, and contracts. The due diligence information provided to Cravath lawyers included the "bringdown" since a July 2008 bond offering Cravath also handled for Airgas.

16.    Cravath lawyers were provided a confidential document identifying topics for Airgas executives to address during conferences with the underwriters' representatives.  Cravath lawyers also participated in a confidential business due diligence conference call where the following topics were discussed:

- "Changes to [Airgas's] general corporate strategy.  Is [Airgas] considering any material strategic actions that may adversely affect the company's ability to service its debt obligations?"
- "[Airgas's] outlook and strategy for acquisitions."
- "[Airgas] anticipate[s] significant changes in its operating costs or costs structure" and "[c]omment on the pricing trends for the company's key raw materials in FY2010."
- "Detailed breakdown of capital expenditures outlook."
- "Airgas's key risk management strategies"
- "Update on expense reduction initiatives"
- "[Airgas's] plans to address maturities of AR facility (2010) and revolver (2011)"
- "Review [of] liquidity and bank credit line availability"

In connection with this offering, Cravath partner Ronald Cami ("Cami") also reviewed and amended the "Change of Control Triggering Event" provisions in the bond financing documents.

17.    After the bond issuance closed on September 11, 2009, Cravath continued in its role as Airgas's sole financing law firm.  On September 25, 2009, Sullivan emailed Cami seeking advice with respect to vendor financing to accommodate a large customer relationship, and Cami responded with legal advice.  A few days later, Cami sent Sullivan an email which

bespeaks the continuing nature of their relationship – one built up after years of working together:

> Hey Joe - Hope you are well.  We are hearing that Vanguard is sending a letter to the CEOs of nearly 1,000 companies regarding corporate governance.  I am not sure Airgas will be on their radar screen, but if you are, we have people here who deal with that sort of thing all the time and would be very happy to help in any way we can.

18.     Thus, at the end of September, Cravath not only anticipated doing Airgas's legal work – but it was aiming to expand that work. In that very same email chain, Sullivan stated Airgas's plan to make note purchases "next quarter" and sought related legal advice.

19.     In September and October 2009, Sullivan conferred with Cami concerning a range of issues to be discussed at an upcoming Finance Committee meeting.  These discussions required disclosure to Cravath of confidential information concerning Airgas's capital structure, financing preferences, projected liquidity position, and anticipated operating performance. Issues discussed included retirement of debt through open market repurchases, tenders and the exercise of call options; the implications of debt retirement upon Airgas's disclosure requirements and its ability to use dividend and share repurchases in the future; replacement of the maturing receivables purchase agreement with a swapped note issuance versus a new receivable purchase agreement; note issuance to finance a tender of existing subordinated note; and a new credit agreement with modified material adverse effect application so as to support Airgas's ambition to issue commercial paper.  All of these discussions again required disclosure to Cravath of highly confidential, non-public and sensitive information concerning Airgas's internal operations and finances, as well as Airgas's near- and long-term market strategies.

20.     In the Fall of 2009, Cami highlighted on his website bio that Airgas was a "key" client of Cravath.  For example, in conjunction with an October 8-9, 2009 CLE in California, Cami's faculty bio lists Airgas as a "key corporate" client of Cravath.[2]

21.     Indeed, Cami provided further legal advice to Sullivan throughout the month of October.  On October 16, Cami responded to Sullivan's request to review certain provisions of a customer agreement.  Cami's response concluded with a question for follow-up by Sullivan and, obviously, was not intended to be the "final" communication on the legal questions presented.

22.     Another email from Cami to Sullivan on October 16 provided legal advice in connection with guarantor note disclosure.  Again, on October 19, Cami and Sullivan engaged in a back and forth, with Sullivan requesting that Cami review commercial contract provisions.  And, again, Cami's response asked several questions of Sullivan to help him provide the proper advice, indicating that his response was not final and that the provision of advice was ongoing.  Then, on October 20, Cami wrote to Sullivan with a more in-depth discussion of the guarantor footnote issue, articulating the legal standard and applying it to Airgas's circumstances.  In the afternoon of October 28, Cami amended and transmitted a proposed resolution for consideration by the Airgas Board, authorizing Airgas to issue additional debt securities.

23.     In mid-October, Airgas and Cravath were also discussing the next financing project:  the March 2010 renewal of certain financing structures.  On October 14, 2009, Airgas's Assistant Treasurer, Robert Bartos ("Bartos"), emailed Cravath partner Joel Herold stating, "We are starting to think about the impending renewal of the liquidity facilities in March 2010."  Bartos attached a summary of confidential terms and asked that Herold review and provide comments.  Bartos also listed several questions concerning the paperwork and requested a call

---

[2] Cami kept Airgas on his website bio until approximately mid-January, when his website bio was redacted, undoubtedly for tactical reasons, to airbrush out the reference to Airgas as a Cravath client.

with Herold.  Herold responded that day, stating that he would take the "next couple of days" to review the documents.  Bartos and Herold set up a call for a week later, on October 21, to speak further on the issues.  On October 20, Herold emailed Bartos, stating that something had come up and asking to reschedule the call, promising to "get back to [Bartos] with some other days/times that would work as soon as I can."  He never did.

24.     Throughout October 2009, Airgas anticipated working with Cravath in connection with a series of pending financing transactions involving Airgas's senior debt instruments.  On October 1, Airgas hosted a private teleconference for its lenders, and Airgas asked for Cravath's input on its presentation, including plans for refinancing the Accounts Receivable Securitization and Revolving Credit Agreements, and issuing additional notes.  Airgas discussed with Cravath its desire to obtain a capital structure sufficient to support a commercial paper program, and how this would entail removing Material Adverse Effect language from the next Revolving Credit Agreement.  Airgas also informed Cravath that these plans would require issuance of additional public debt to reduce the proportion of funding coming from short-term sources.

25.     During this time, Airgas was also consulting with Cami on a range of issues to be discussed at an upcoming Finance Committee meeting.  These confidential discussions considered potential legal impediments to Airgas's plans to alter its debt capital structure before such plans were reviewed with the Committee.  Sullivan also discussed with Cami using public notes to refinance the Accounts Receivable Securitization.  Airgas then requested that Cravath prepare a resolution enabling the issuance of additional notes.

26.     On October 28, 2009, Cravath (through Cami) delivered to Sullivan a draft Board Resolution, prepared by Cravath at Airgas's request, authorizing an anticipated debt issuance.

**Airgas Learns of and Immediately Objects to Cravath's Conflict of Interest**

27.   On October 28, 2009, after delivering a draft Board Resolution to Airgas, Cami advised Robert H. Young, Jr. ("Young"), Airgas's Senior Vice President and General Counsel, by phone that Cravath could no longer represent Airgas due to a conflict arising from Cravath's simultaneous representation of a third party in a potential transaction involving Airgas.

28.   At the time of his initial October 28, 2009 telephone conversation with Young, Cami declined to identify the other party involved in the conflicting representation, but said the identity of that party was known to Airgas CEO Peter McCausland ("McCausland").

29.   Two days later, Young had a second telephone conversation with Cami, in which Leslie F. Graff ("Graff"), Airgas's Senor Vice President for Development, also participated. During that call, Young advised Cami that Airgas had significant concerns about Cravath's representation of another party in a transaction adverse to Airgas, in light of the extensive work Cravath had performed for Airgas over the preceding eight years and the intimate knowledge Cravath had acquired regarding Airgas's operations, business plans, financing preferences and market strategy.

30.   In response, Cami explained that the decision was driven by business considerations, expressly stating that the other client had provided Cravath with more work over a longer period of time.

31.   At the conclusion of the call, Young reiterated that Airgas was not comfortable with Cravath representing another party in a transaction adverse to Airgas, and Cami expressly acknowledged Airgas's objection to Cravath's representation of the other party in the potential transaction involving Airgas.

32.     Cami said he would consult with others at Cravath to protect Cravath because there was nothing more important than their reputation.

33.     The transaction that caused the conflict was the potential takeover of Airgas by Air Products and Chemicals, Inc. ("Air Products").  Unbeknownst to Airgas, its own law firm, Cravath, was representing and advising Air Products on how to acquire or take over Airgas – and it had been doing so at the very time it was actively representing Airgas in its financings.

34.     Based on affidavits presented by Cravath, it appears that Cravath started representing and advising Air Products in its attempted acquisition of Airgas in late August 2009, but it did not seek a waiver or inform Airgas until October 28, 2009.

35.     At a meeting between the CEO of Air Products and the CEO of Airgas, in Radnor, Pennsylvania, on October 15, 2009, Air Products made an unsolicited offer to acquire Airgas through a stock-for-stock transaction.  Even at that meeting, Air Products did not inform Airgas that it was being advised on its acquisition strategy by Cravath.  Neither did Cravath inform Airgas that it had a conflict until October 28, 2009.

36.     Cravath was aware that the timing of Air Products' offer could negatively affect Airgas's ability to implement its financing plans.  Airgas has in fact been injured by the timing of Air Products' offer letter, in that it has not been able to tender for its 7.125% subordinated notes on the terms originally available.

37.     The Board of Directors of Airgas considered Air Products' stock-for-stock acquisition offer at a meeting on November 5, 2009, and unanimously agreed that McCausland should communicate to Air Products that Airgas was not interested in the proposed transaction.

38.     On November 11, 2009, McCausland communicated the Board's decision to reject Air Products' offer to Air Products' Chairman, President, and Chief Executive Officer, John McGlade ("McGlade").

39.     Having received no further response from Cravath regarding Airgas's objection to Cravath's representation adverse to Airgas, Young wrote to Cami on November 12, 2009, to reiterate Airgas's objection, specifically advising as follows:

> In view of your firm's representation of Airgas on our financings and the access your firm has received to our company's material non-public information and to members of our senior management, Cravath has a conflict in representing Air Products in a potential merger or business combination transaction with Airgas.
>
> In light of the Airgas Board's position, please accept this letter as notice that Airgas does not consent to Cravath's continued representation of Air Products in matters concerning Airgas.

40.     Although Airgas's Board of Directors had already rejected Air Products' stock-for-stock offer, McGlade sent Airgas a letter on November 20, 2009, reiterating Air Products' offer.

41.     By letter dated November 23, 2009, Cravath partner Stuart W. Gold ("Gold") finally responded to Airgas's October 28, 2009 position (repeated in the November 12 letter) that it did not consent to Cravath representing Air Products in relation to the proposed transaction involving Airgas.

42.     In his November 23, 2009 response, Gold, on behalf of Cravath, stated that he had concluded that Cravath "is not in possession of material non-public information with respect to Airgas," despite its extensive representation of Airgas for nearly a decade, and that Cravath intended to continue in its representation of Air Products in relation to the proposed transaction involving Airgas.

43.     By letter dated December 8, 2009, McCausland wrote to McGlade to respond to Air Products' November 20, 2009 offer letter.  In his December 8, 2009 letter, McCausland again confirmed that Airgas's Board of Directors had considered and rejected Air Products' stock-for-stock offer, on the grounds that it grossly undervalued Airgas, proposed unattractive currency, ignored regulatory issues that a combination of the companies might present, and because Airgas's Board of Directors questioned Air Products' ability to manage Airgas's business, given Air Products' decision to exit that very line of business just seven years earlier.

44.     McCausland's December 8, 2009 letter also informed Air Products that Airgas objected to Cravath's representation of Air Products in connection with any possible acquisition of Airgas and that Airgas had no intention of waiving or ignoring the conflict created thereby.

45.     In closing, McCausland's December 8, 2009 letter strongly affirmed that the Airgas Board of Directors was "not interested in pursuing [Air Products'] proposal" further, thus making clear that there would be no amicable transaction with Air Products.

46.     By letter dated December 9, 2009, Young responded to Gold's November 23, 2009 letter, advising Gold that Airgas disagreed with Cravath's conclusory and evasive analysis of the conflict issue and demanding that Cravath "desist from further representation of Air Products with respect to any contemplated transaction involving Airgas."

47.     In his December 9, 2009 letter to Gold, Young noted that Cravath had obtained confidential information, under attorney-client privilege, concerning Airgas's near-term financing alternatives and preferences as recently as October of 2009, at which time it now appears Air Products was already planning, with assistance from Cravath, an unsolicited offer to acquire Airgas.

48.    Young's December 9, 2009 letter further noted that Cravath's intimate knowledge of Airgas's financing strategies and preferences represented "confidential information" under the Rules of Professional Conduct and that access to that information would present an unfair advantage to Air Products in formulating an acquisition strategy with respect to Airgas, to the distinct disadvantage of Airgas.

49.    Young's December 9, 2009 letter also stated that Air Products' unsolicited offer, as to which Cravath was advising Air Products, was hindering Airgas from implementing the very financing strategies that had been developed in consultation with Cravath just weeks earlier.

50.    Given the clear conflict presented by Cravath's representation of Air Products in connection with Air Products' proposed acquisition of Airgas, Young's December 9, 2009 letter again demanded that Cravath withdraw from its representation of Air Products.

51.    On December 11, 2009, on behalf of Cravath, Gold responded to Young's letter, stating that Cravath had not altered its position; in his letter, Gold expressed the belief that Cravath did not possess any "confidential information" that created a conflict of interest.  Gold stated that he did not believe Cravath needed to withdraw from its representation of Air Products in connection with the potential acquisition of Airgas.

52.    Young sent a letter to Gold on December 14, 2009, stating that he was shocked by Gold's statement that Cravath did not possess confidential information about Airgas, in light of Cravath's frequent conversations with members of Airgas's senior management regarding non-public, sensitive financial and strategic information.  Young referred to Airgas's conversations with Cravath in mid-October.  Young also pointed out that Air Products' proposal could result in a hostile transaction, and Young stated again that Airgas did not consent to Cravath's acting as Air Products' counsel.

53.     Young's December 14, 2009 letter also stated that "Air Products and its counsel, Cravath, must have known that Air Products' written proposal could negatively impact the very liquidity-related transactions as to which Cravath had so recently been advising Airgas."

54.     To date, Airgas has received no response from Gold or any other Cravath representative to Young's December 14, 2009 letter.

55.     Unilaterally, abruptly, and without consent from its long-time client, Cravath terminated its legal representation of Airgas.  Meanwhile, Cravath continues to counsel Air Products in its hostile takeover of Airgas.

56.     Despite Airgas's explicit rejection of Air Products' offer and clear statement that Airgas is not interested in pursuing a potential combination of the companies, McGlade again wrote to McCausland on December 17, 2009, to "reiterate Air Products' continued strong interest" in acquiring Airgas.

57.     In support of Air Products' assertion that a combination of the companies would present certain advantages and opportunities that Airgas could not realize on its own, McGlade's December 17, 2009 letter notably asserted that the proposed acquisition would provide "increased cash flow and capital access...to fund greater growth opportunities globally," thus indicating that Airgas's financing structure was a factor in Air Products' acquisition offer.

58.     McGlade's December 17, 2009 letter also summarily dismissed Airgas's previously expressed concerns about the direct conflict of interest presented by Cravath's representation of Air Products in the proposed acquisition of Airgas, implicitly acknowledging that Cravath was continuing in its role as counsel to Air Products despite Airgas's repeated demands that Cravath withdraw from that conflict-ridden representation.

59.     On February 1, 2010, Airgas learned for certain that Cravath was continuing to provide legal and strategic advice to Air Products concerning its attempted takeover of Airgas, when a Cravath attorney contacted counsel to Airgas.  During that conversation, counsel for Airgas reiterated Airgas's objection to Cravath's participation due to its conflict of interest, and again Cravath failed and refused to withdraw from the Air Products representation.

60.     On February 4, 2010, Air Products made public its offer to acquire Airgas.  A February 5, 2010 press release by Air Products details the offer and notes that Air Products' "legal advisors are Cravath, Swaine & Moore LLP and Arnold and Porter LLP."  The press release also includes a statement by McGlade that Air Products is "prepared to take all necessary steps to complete [the proposed transaction], including making an offer directly to Airgas shareholders."  In other words, Air Products was preparing to pursue a hostile takeover of Airgas with the benefit of Cravath's strategic counsel.

61.     A February 5, 2010 *New York Times* article concerning the Air Products offer also states that Air Products hired Cravath as their counsel.  The *New York Times* article also notes that "[b]y making its offer now, Air Products is hoping to seize upon some current weakness in Airgas's financial health."

62.     On February 5, 2010, Air Products filed an action against Airgas and members of its Board of Directors in Delaware Chancery Court, alleging breach of fiduciary duty by Airgas's Board of Directors in rejecting Air Products' offer and seeking declaratory and injunctive relief, enjoining action that would interfere with Air Products' offer "in a manner inconsistent with their fiduciary duties."  *See Air Prods. and Chems., Inc. v. Airgas, Inc., et al.* (Del. Ch. Feb. 5, 2010).  Tellingly, Cravath is named on the papers as Air Products' counsel.

63.     After receiving confirmation that Cravath was continuing in its representation of Air Products in its attempt to take over Airgas, Airgas was left with no choice but to seek the Court's intervention to protect its interests.  On February 5, 2010, Airgas filed a complaint in the Pennsylvania Court of Common Pleas seeking, *inter alia*, injunctive relief requiring Cravath to "immediately withdraw from its representation of Air Products or any other party in relation to any transaction or proposed transaction involving Airgas."

64.     Cravath refused to withdraw from its representation of Air Products adverse to Airgas, and continued to represent Air Products when it launched a hostile tender offer for Airgas shares on February 11, 2010.

65.     Cravath has acted as lead counsel for Air Products in its hostile takeover litigation and public relations campaign against Airgas.  Indeed, at the October 2010 trial of the Air Products claims against Airgas and its board, Cravath lawyers acted as lead trial counsel in the effort to force a sale of Airgas to Air Products.

66.     Cravath's own affidavits in its Delaware action make clear that Cravath had been aware of Air Products' interest in a takeover of Airgas since at least 2007.  In a sworn affidavit submitted in support of Cravath's motion for a declaratory judgment, Cravath partner James Woolery stated:

> In late December 2007/early 2008, John Stanley, who is now Air Products' general counsel, raised with me the idea of a possible business combination with Airgas.  Because management's thinking was merely preliminary, and no Board authorization existed, Mr. Stanley asked only that Cravath provide him with a summary of public information about Airgas.  That was done, but Air Products' management shelved the idea for the foreseeable future.

67.   Woolery's affidavit continues: "At approximately the very end of August/early September 2009, Air Products raised with Cravath the possibility of Air Products approaching Airgas about a potential friendly combination." At or about that time, Cravath began advising Air Products on its possible acquisition of Airgas.

68.   By Cravath's own words, then, Cravath's complicity in Air Products' takeover of Airgas overlaps with the time when Airgas was looking to and paying Cravath for undivided loyalty in its representation of Airgas. Moreover, during the period of late August through October 28, 2009, Cravath intentionally sought to keep its dual representation of Airgas and Air Products a secret from Airgas and never disclosed its adversity to Airgas to anyone at Airgas.

## COUNT I – BREACH OF FIDUCIARY DUTY

69.   Plaintiff incorporates by reference as if fully set forth herein each and every allegation of Paragraphs 1 - 68 above.

70.   Cravath, as Airgas's longstanding legal counsel, owes Airgas the fiduciary duty of loyalty.

71.   Cravath has breached the fiduciary duty of loyalty it owes Airgas by continuing to represent Air Products in connection with a hostile takeover of Airgas.

72.   Cravath failed to adhere to the governing standards of professional conduct and otherwise breached its obligations to Airgas by elevating the interests of one current client over the interests of another client and by failing and refusing to abide by the direction of its client Airgas not to counsel and assist Air Products in its strategic efforts to acquire Airgas.

73.   Despite being requested by Airgas to cease and desist from representation of Air Products in connection with its potential takeover of Airgas, Cravath has continued to provide legal counsel to Air Products in this capacity.

74. Cravath was approached by Air Products in late August 2009 and was asked to take on a matter directly adverse to Airgas. At that time, Cravath was actively representing Airgas in a financing that was due to close in September 2009.

75. Despite its active and concurrent representation of Airgas in August-October 2009, Cravath never sought Airgas's permission to represent Air Products in a potentially adverse acquisition; instead, Cravath intentionally kept its new and adverse representation of Air Products hidden from Airgas.

76. By reason of Cravath's breach of its duty of loyalty, Airgas has been proximately damaged. As a proximate result of Cravath's wrongful conduct, Airgas has been required to retain new outside counsel to seek to enforce Cravath's ethical and fiduciary obligations, and it has incurred legal fees and costs in doing so, which legal fees and costs should be reimbursed by Cravath.

77. Airgas has also been proximately damaged to the extent it has been required to retain replacement outside counsel to develop an understanding of Airgas's financing needs and objectives in order to provide legal services concerning the Airgas credit facilities and financing requirements that would otherwise have been provided by Cravath attorneys.

78. Airgas has also been proximately damaged in that it has been unable to execute all aspects of its financing plan because of Air Products' takeover offer, and Cravath, Air Products' counsel with respect to the takeover, knew that the timing of Air Products' offer letter could negatively affect Airgas's financing plans. Moreover, as Airgas's long-time counsel, Cravath knew that Airgas was planning to seek new financing around the time of Air Products' letter seeking acquisition of Airgas.

79.    Finally, Airgas has been proximately damaged in that it paid Cravath $322,800 for services rendered while Cravath was secretly and simultaneously representing Air Products adverse to Airgas.

WHEREFORE, Airgas respectfully requests judgment against Cravath in an amount in excess of $150,000.00 to be determined at trial, costs, attorneys' fees, interest, and such other relief as this Court finds to be just and equitable.

## COUNT II – CLAIM FOR PUNITIVE DAMAGES

80.    Plaintiff incorporates by reference as if fully set forth herein each and every allegation of Paragraphs 1 - 79 above.

81.    Cravath's representation of, and strategic assistance to, Airgas's direct competitor in a potentially hostile takeover attempt, while Cravath was armed with sensitive, non-public information regarding Airgas's internal affairs, personnel, finances, and short- and long-term financing objectives, alternatives, and preferences, was intentional, willful, outrageous, malicious, and with reckless indifference to the consequences to Airgas.

82.    Cravath's conduct has injured Airgas.  Airgas has incurred substantial fees and costs in enforcing the fiduciary duties owed to it by Cravath and in hiring replacement corporate counsel.  Airgas has also been injured in that it has been unable to execute all aspects of its financing plan because of Air Products' takeover offer, and Cravath, Air Products' counsel with respect to the takeover, knew that the timing of Air Products' offer letter could negatively affect Airgas's financing plans.

WHEREFORE, Airgas respectfully requests punitive damages in an amount to be determined at trial, and such other relief as this Court finds to be just and equitable.

Respectfully submitted,

COZEN O'CONNOR

By:    /s/ Stephen A. Cozen
          Stephen A. Cozen, Esquire
          Jeffrey G. Weil, Esquire
          Thomas G. Wilkinson, Jr., Esquire
          1900 Market Street
          Philadelphia, PA 19103
          215-665-2000

          Attorneys for Plaintiff, Airgas, Inc.

Date:  December 7, 2010

## CERTIFICATE OF SERVICE

I, Tamar S. Wise, Esquire, hereby certify that on December 7, 2010, a copy of the

foregoing Amended Complaint was served, via regular mail, on the following counsel of record:

Nancy J. Gellman, Esquire
John A. Guernsey, Esquire
Robert N. Feltoon, Esquire
Nicholas M. Centrella, Esquire
Conrad O'Brien, P.C.
1515 Market Street, 16th Floor
Philadelphia, PA 19102

Attorneys for Defendant, Cravath, Swaine & Moore LLP